Slip Op. 99-92

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| AIMCOR and SKW Metals & Alloys, Inc., | : | |
| Plaintiffs, | : | **Court No. 97-09-01534** |
| | : | **Before: Barzilay, Judge** |
| v. | : | |
| United States of America, | : | |
| Defendant, | : | |
| and | : | |
| Companhia Ferroligas Minas Gerais-Minasligas and Companhia Brasileira Carbureto De Calcio, | : | |
| Defendant-Intervenors. | : | |

[Plaintiffs' Motion for Judgment Upon the Agency Record granted in part, denied in part. Remanded to Commerce.]

Decided: September 1, 1999.

Baker & Botts, L.L.P. (William D. Kramer, Martin Schaefermeier), for Plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice (John K. Lapiana); Dean A. Pinkert, Attorney Advisor, Office of the General Counsel, Department of Commerce, of counsel, for Defendant.

Dorsey & Whitney, L.L.P. (Munford Page Hall, II and Philippe M. Bruno), for Defendant-Intervenors.

### OPINION

### I. INTRODUCTION

**BARZILAY, JUDGE:**

This case is before the Court pursuant to 19 U.S.C. § 1516a (1994) and 28 U.S.C. §1581(c)

(1994) on Plaintiffs' USCIT R. 56.2 Motion for Judgment Upon the Agency Record. Plaintiffs challenge certain aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination in *Ferrosilicon from Brazil; Amended Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 54,085 (Oct. 17, 1997). Defendant partially opposes Plaintiffs' motion, but agrees that a remand is required to enable Commerce to reconsider a number of issues listed in Part IV of the opinion below. For the reasons set out in the opinion which follows, the Court also remands the case to Commerce for the additional purpose of calculating defendant-intervenor's, Companhia Brasileira Carbureto De Calcio, financial expenses based upon its own 1995 financial statements and to recalculate cost of production ("COP") using the new ratio.

## II.   BACKGROUND

On April 25, 1996, Commerce published notice of initiation of an antidumping duty administrative review covering ferrosilicon from Brazil. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 61 Fed. Reg. 18,378 (April 25, 1996); *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 61 Fed. Reg. 26,158 (May 24, 1996). The period of review ("POR") was March 1, 1995 through February 29, 1996.

Plaintiffs, AIMCOR and SKW Metals & Alloys, Inc. ("AIMCOR"), are United States producers of ferrosilicon and were petitioners in the administrative review before Commerce. Defendant-Intervenors, Companhia Brasileira Carbureto De Calcio ("CBCC") and Companhia Ferroligas Minas Gerais-Minasligas ("Minasligas"), are Brazilian producers of ferrosilicon and were

respondents in the administrative review.

In the preliminary results of the administrative review, Commerce determined that sales of ferrosilicon from Brazil had been made below normal value ("NV") and established a 2.27% margin for CBCC and a 7.98% margin for Minasligas. *Ferrosilicon from Brazil*; *Notice of Preliminary Results of Antidumping Administrative Review*, 62 Fed. Reg. 16,763 (April 8, 1997) ("Preliminary Results"). In the Final Results, Commerce established a 3.51% margin for Minasligas and a 0% margin for CBCC. *Ferrosilicon from Brazil; Notice of Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 43,504 (Aug. 14, 1997) ("Final Results"). In the amended final results, Commerce revised the margin for Minasligas to 2.54%. *Ferrosilicon from Brazil; Amended Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 54,085 (Oct. 17, 1997) ("Amended Final Results").

AIMCOR timely filed a summons and complaint challenging certain aspects of the final results and the amended final results of the second administrative review of the antidumping duty order on ferrosilicon from Brazil issued by Commerce.

### III. STANDARD OF REVIEW

In this review of Commerce's final determination, the Court is charged to hold unlawful any determination, finding, or conclusion that is unsupported by "substantial evidence on the record, or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

To determine whether Commerce has acted in accordance with law, the Court must undertake the two step analysis prescribed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). First, the Court must determine whether the statute speaks to the precise question at issue. *Id.* at 842. If the statute is clear or the legislative history unambiguously expresses Congress' intent, then the matter is at an end for the agency cannot contravene the will of Congress. *Id.* at 842-43. Second, if the Court determines that the statute is silent or ambiguous, the question then becomes whether the agency's construction of the statute is permissible. *Id.* at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996); *see also Matsushita Electric Industrial Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. *See IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "court will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." *Negev Phosphates, Ltd. v. United States*, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988).

## IV.    DISCUSSION

*A.    Issues for which Commerce agrees to remand*

AIMCOR and Commerce request, and the Court grants, that the following issues be remanded for the appropriate calculations and disposition:

1.    Commerce agrees with AIMCOR that it erred by subtracting the full amount of Brazilian value added tax ("ICMS" or "VAT") collected by Minasligas on home market sales. Thus,

Commerce requests a remand to permit a margin calculation based upon the assumption that the VAT charges were passed to United States customers and to make corresponding changes, if any.

2.      Commerce concedes that the calculation of insurance revenue for a sale identified by AIMCOR was incorrect. As a result, Commerce requests a remand to recalculate insurance revenue for that sale.

3.      Commerce concurs that it erred by failing to include depreciation for certain idle assets in the calculation of CBCC's COP and constructed value ("CV") figures. Thus, Commerce requests a remand so it may determine whether depreciation costs for idle assets should be considered in calculating CBCC's COP and CV.

4.      Commerce agrees with AIMCOR that CV for CBCC was erroneously calculated because home market commissions were not considered. Thus, Commerce requests a remand so it may include home market commissions in its calculation of CV.[1]

B.      *Contested Issues*

        *1.      Depreciation*

AIMCOR contends that Commerce used Minasligas' grossly understated depreciation

---

[1] Defendant-Intervenor contends that the issue of commissions should not be remanded because AIMCOR never argued this issue during the administrative review below. *Def-Intervenor's Br.* at 16. However, the Court grants remand in spite of Defendant-Intervenor's argument because the "failure to exhaust administrative remedies is an affirmative defense that must be presented in the pleadings. The failure to plead an affirmative defense results in a waiver of the defense." *Cemex, S.A. v. United States*, 19 CIT 587, 594, (1995) (citing *Manifattura Emmepi S.p.A. v. United States*, 16 CIT 619, 621, 799 F.Supp. 110, 112-13 (1992)); *United States v. Atkinson*, 6 CIT 257, 259, 575 F.Supp. 791, 793 (1983). This affirmative defense does not appear in the answer of either Defendant-Intervenor in this case.

expenses in its COP and CV calculations[2], and, therefore, Minasligas' reported depreciation costs do not reasonably reflect actual costs. *Pl.'s Br.* at 6-7, 15. Commerce used Minasligas' reported monthly amounts of depreciation as part of fixed factory overhead. Final Results at 43,511. Minasligas relied upon a 20% yearly depreciation rate, or five year depreciation period for its machinery and equipment for the period of 1994-1995. Thus, Minasligas' machinery and equipment had been fully depreciated prior to Commerce's investigation. *Pl.'s Br.* at 7.

AIMCOR asserts that such use of accelerated depreciation is grossly distortive because it shifts to years prior to the POR almost all of the depreciation attributable to the production of ferrosilicon during the POR. *Pl.'s Br.* at 11. AIMCOR argues that such a practice violates the fundamental accounting principle that costs must be properly matched with revenues. *Id.* at 12. AIMCOR also argues that Minasligas' accelerated depreciation is consistent only with Brazilian income tax regulation, not Brazilian Generally Accepted Accounting Principles ("GAAP"). *Id.* at 15.

AIMCOR contends that even if such depreciation expenses did conform to Brazilian GAAP, they would still be deemed distortive by United States standards. AIMCOR asserts that 19 U.S.C. § 1677b(f)(1)(A) provides that costs are to be calculated based on the respondent's records only to the extent those records are kept in accordance with the GAAP of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise. *Id.* at 8. Moreover, the  Statement of Administrative Action ("SAA"), accompanying the Uruguay Round Agreements Act, states that "[i]n determining whether a company's records reasonably reflect costs,

---

[2] This calculation is undertaken by Commerce when it determines that normal value cannot be ascertained by comparing sales in the exporting country to sales in the United States.

Commerce will consider United States [GAAP]. . . ." *See* Statement of Administrative Action, H.R. DOC. NO. 103-316, 103rd Cong., 2nd Sess. (1994), *reprinted in* URUGUAY ROUND AGREEMENTS ACT, LEGISLATIVE HISTORY, Vol. VI, at 834. AIMCOR contends that United States GAAP requires the cost of an asset to be spread over the expected useful life of an asset and the allocation of such costs distributed equitably among the periods during which payments are obtained from the use of an asset. *Pl.'s Br.* at 15. AIMCOR thus argues that a five year useful life fails to equitably allocate the costs of Minasligas' furnaces because the furnaces have a twenty year useful life and because they have remained in service long after the end of the depreciation period. *Id.*

Commerce argues that it reasonably relied upon Minasligas' reported depreciation. *Def.'s Br.* at 6. Commerce states that Minasligas' depreciation methodology was acceptable because it was (1) GAAP consistent, (2) reflected in the exporter's audited financial statements, (3) reasonably indicative of costs associated with the production and sale of the merchandise, and (4) consistent with the exporter's historical practices. *Id.* at 8 (citing 19 U.S.C. § 1677b(f)(1)(A)). In addition, Commerce relies upon the SAA in presuming that absent (1) an extreme allocation of depreciation to the first year, (2) depreciation of idle assets, (3) the non-historical use of the depreciation methodology, and (4) the shifting of costs away from the subject merchandise, the exporter's reported depreciation may be used in calculating COP or CV. *Id.* at 9 (citing SAA at 834-35).

Commerce states that there is no dispute regarding Minasligas' historical use of a five year depreciation period for the machinery and equipment. *Id.* at 10. Minasligas' financial statements were also audited by independent Brazilian auditors who did not find Minasligas' depreciation methods objectionable. *Id.* at 16. Moreover, at the verification Commerce determined that

Minasligas' depreciation expenses were based upon its records and that no assets were idle during the POR. *Id.* at 10. Further, Commerce obtained information regarding the allowable useful life of assets for Brazilian income tax purposes, and as indicated in the verification report, in Brazil heavy machinery and equipment used twenty-four hours a day are allowed to be depreciated over five years. *Id.* Finally, Commerce asserts that if it had followed AIMCOR's request to recalculate Minasligas' depreciation period using a twenty year useful life for machinery and equipment, depreciation and amortization costs captured in previous reviews would be double counted. *Id.* at 16, n.8. Thus, Commerce concluded that the methodology was acceptable. *Id.* at 17.

The Court finds that AIMCOR has failed to demonstrate that Commerce's decision to use Minasligas' five year depreciation period is distortive and, therefore, contrary to the statute. In examining this issue, the Court relies upon 19 U.S.C. § 1677b(f)(1)(A) and the SAA. 19 U.S.C. § 1677b(f)(1)(A) provides that, for purposes of COP and CV calculations:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

The relevant portion of the SAA provides:

> In determining whether a company's records reasonably reflect costs, Commerce will consider U.S. generally accepted accounting principles employed by the industry in question. For example, a company's records might not fairly allocate the cost of an asset if a firm's financial statements reflect an extremely large amount of depreciation for the first year of an asset's life, or if there is no depreciation expense reflected for assets that have been idle. In such a situation, it would be appropriate

> for Commerce to adjust depreciation expenses. Costs shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review . . . . Commerce also will consider whether the producer historically used its submitted cost allocation methods to compute the cost of the subject merchandise prior to the investigation or review and in the normal course of its business operations. Also, if Commerce determines that costs, including financing costs, have been shifted away from production of the subject merchandise, or the foreign like product, it will adjust cost appropriately, to ensure they are not artificially reduced.

*See* Statement of Administrative Action, H.R. DOC. NO. 103-316, 103rd Cong., 2nd Sess. (1994), *reprinted in*, URUGUAY ROUND AGREEMENTS ACT, LEGISLATIVE HISTORY, Vol. VI, at 834-35.

Applying step one of the *Chevron* analysis to this precise issue, the Court notes that the statute is silent with regard to the method Commerce must use to establish depreciation expenses in COP calculations. Therefore, the Court must determine whether Commerce's construction of the statute is reasonable and, pursuant to the statutorily mandated review standard, 19 U.S.C. §1561a(1)(B), whether it is supported by substantial evidence.

The record shows that Minasligas has historically used a five year depreciation period for its machinery and equipment, and none of the parties dispute this fact; thus, Minasligas has not prepared its financial records for this review. *See* Verification Report at 5. Minasligas' depreciation was based upon its records and no assets were idle during the POR. *Id.* at 27. Since Minasligas depreciated its machinery and equipment 20% over five years, the company did not take an extremely large amount of depreciation during the assets' first year, and, thus, its method is not suspect under the SAA.

The Court finds it unnecessary to sort out which governing Brazilian body determines Brazilian GAAP and defers to Commerce for that determination. Nevertheless, there is no evidence

on the record that Minasligas' financial records are not kept in accordance with Brazilian GAAP. The records were audited by independent Brazilian auditors who confirmed adherence to a permissible depreciation methodology. *Id.* at 5.

Where "the reviewing court is faced with two opposing views of the record, that of Commerce and that of the petitioner, it is the function of the Court to uphold the determination of the agency if it is substantiated by evidence on the record and is otherwise in accordance with law." *Hercules Inc. v. United States*, 11 CIT 710, 739-40, 673 F. Supp. 454 (1987). In that case, defendant-intervenor, SNPE, challenged the antidumping order, in part related to its depreciation costs calculations. *Id.* at 746. SNPE argued that Commerce erred in using an accelerated depreciation tax method rather than a straight line method. *Id.* at 755. Commerce defended its position by stating that SNPE deviated from its own normal accounting practice by utilizing the straight line method. *Id.* Commerce also argued that it was SNPE's duty to provide verifiable substantiating evidence to support its claim that depreciation costs would be more accurately reflected by straight line methodology. *Id.* Commerce provided its own verification reports to substantially support its findings. *Id.* The court held that Commerce's determination was supported by substantial evidence because Commerce had chosen the verified financial statements as the best information available. *Id.* at 756. Thus, Commerce need not accept SNPE's unverified allegation that the straight line methodology would more accurately reflect costs. *Id.*

Similarly, in the case at hand, Commerce used Minasligas' verified financial statements which were independently audited by Brazilian auditors. These records provided Commerce with the means to make a rational decision supported by substantial evidence. AIMCOR does not provide

verifiable records to prove otherwise.  Thus, the Court will not substitute its judgment for that of

Commerce.  As the Federal Circuit court stated in *Daewoo Electronics v. United States*, 6 F.3d 1511,

1517-18 (1993) (citations omitted):

> The specific determination we make is whether the evidence and reasonable inferences
> from the record support [Commerce's findings]. The question is whether the record
> adequately supports the decision of [Commerce], not whether some other inference
> could reasonably have been drawn. As frequently stated, the possibility of drawing
> two inconsistent conclusions from the evidence does not prevent an administrative
> agency's finding from being supported by substantial evidence.

In this case, the record amply supports Commerce's decision to use the depreciation method set forth

in Minasligas' audited and verified financial records.[3]

Moreover, the Court rejects AIMCOR's argument that a five year estimated useful life is

inappropriate.  United States GAAP does not set forth specifics regarding an asset's estimated useful

life.  Entities have much leeway in estimating useful life, as long as the entity meets the goal of

depreciation, i.e., "to provide for a reasonable, consistent matching of revenue and expense by

allocating the cost of the depreciable asset systematically over its estimated useful life."  MILLER

GAAP GUIDE 1999, at Ch. 11, Depreciable assets and depreciation -- Depreciation , *available in*

LEXIS, ACCTG Library, GAAP File.  In addition to the commonly used methods of depreciation,

such as straight-line, units of production, sum-of-the-years'-digits, and declining balance, entities may

choose other methods which meet the criteria of systematic and rational.  *Id.*

United States GAAP states that the "estimated useful life of a depreciable asset is the period

---

[3]The Court notes a recent decision by this court to remand to Commerce a similar
depreciation methodology as distortive.  *See American Silicon Technologies v. United States*, No.
99-34, 1999 WL 354415 (CIT Apr. 9, 1999).  The Court declines to follow this decision for the
reasons discussed herein and in *Hercules* and *Daewoo*.

over which services are expected to be rendered by the asset. An asset's estimated useful life may differ from company to company or industry to industry." *Id.* at Principles of Accounting for Depreciable Assets. With respect to the use of an asset after the time it has been completely depreciated, United States GAAP notes that "[t]otal utility of an asset, expressed in time, is called physical life. The utility of an asset to a specific owner, expressed in time, is called the service life." *Id.* Thus, the estimated useful life is separate and distinct from the amount of time that machinery and equipment may actually operate. In this regard AIMCOR's argument, that Minasligas' depreciation method is distortive because Minasligas is still using its machinery and equipment after full depreciation, logically must fail. Merely because an asset which has been fully depreciated is still being used does not mean that there has been a distortive shift away from systematically and rationally capturing the costs of the machinery and equipment.

In addition, the Court agrees with Commerce when it argues against changing the depreciation methodology from that accepted in prior reviews. Because of the manner in which judicial and administrative reviews of antidumping duty orders occur in one year periods, each a separate proceeding, it is especially important for all parties that consistent methods be sustained when possible. Here, the business records reasonably reflect costs as required by the statute and the agency demonstrated a consistent administrative practice which is reasonable and permitted by the statute.

Therefore, the Court sustains Commerce's conclusion that Minasligas' use of a five year depreciation period is acceptable and reasonable.

2. *Consolidated Financial Statements*

AIMCOR asserts that Commerce erred in determining CBCC's interest expenses based on the company's indirect Belgian parent's financial statements because there is a precise statutory directive that in calculating the cost of production Commerce shall use "the actual amounts incurred and realized by the specific exporter for selling, general and administrative expenses." 19 U.S.C. §1677b(e)(2)(A). Tr. at 6 (Oral Argument, July 9, 1999). Instead Commerce calculated CBCC's interest expenses by multiplying CBCC's cost of manufacture by a financial expense ratio based on the consolidated financial statements of Solvay and Cie, a Belgian conglomerate that owns CBCC's Brazilian parent, Solvay do Brasil. The ratio was determined by dividing the interest expenses by the cost of goods sold shown on the financial statements. AIMCOR asserts that its calculation, based upon the 1995 financial statements of CBCC itself yields a different ratio. Pl.'s Br. at 20. Thus, AIMCOR argues, Commerce's ratio understates the financial costs actually incurred. *Id.*

AIMCOR contends that Commerce is to determine as accurately as possible the true cost of manufacturing the subject merchandise. *Id.* at 21. AIMCOR argues that using consolidated financial statements in this case does not provide an accurate figure for costs of manufacturing, and that this method is unreliable and distortive of actual costs. *Id.* at 22. AIMCOR posits that using CBCC's 1995 financial statements will yield a more accurate figure of the actual costs of manufacturing the subject merchandise.

Commerce's argument defending its interpretation of the statute as allowing the use of consolidated financial statements is based upon the premise that money is fungible and that the corporate parent within a consolidated group possesses the power to determine the capital structure of each member company. *Def.'s Br.* at 17. Commerce relies upon its "well-established practice of

deriving net financing costs based on the borrowing experience of the consolidated group of

companies." *Id.* at 19 (citations omitted). Commerce further bases its argument upon United States

GAAP and language found in the Accounting Research Bulletin No. 51 ("ARB 51") and Statement

of Financial Accounting Standard 94 ("FAS 94"), which amends ARB 51. *Id.* at 19.

ARB 51, as amended by FAS 94, requires that all investments in which a parent company has

a controlling financial interest represented by the direct or indirect ownership of a majority voting

interest (more than 50%) be consolidated, except those in which (a) control of the subsidiary is

temporary, or (b) significant doubt exists regarding the parent's ability to control the subsidiary. For

example, a subsidiary in legal reorganization or bankruptcy is controlled by the receiver or trustee and

not by the parent company. *See* FAS 94 ¶ 13. Moreover, FAS 94  states:

> There is a presumption that consolidated statements are more meaningful than
> separate statements and that they are usually necessary for a fair presentation when
> one of the companies in the group directly or indirectly has a controlling financial
> interest in the other companies.

FAS ¶ 1. Since the record establishes that Solvay & Cie owned 100% of the equity in Solvay do

Brasil, which, in turn owned 99.86% of the equity in CBCC, Commerce argues that it is reasonable

for it to rely upon consolidated financial statements. *Id.* at 20-21; *see also Def.'s Letter Br.* at 1-3.

The Court finds that AIMCOR has sufficiently demonstrated that Commerce erred in  basing

its calculation of CBCC's financial expenses upon Solvay & Cie's consolidated financial statements.

Applying the first step of the *Chevron* analysis to the precise issue in question demonstrates that the

statutory language contains an ambiguity in the words "specific exporter or producer" in that the

statute does not specify at what corporate organizational level, i.e. parent, subsidiary, etc. the specific

exporter should be designated. *See* 19 U.S.C. §1677b(e)(2)(A) ("The constructed value . . . shall be

. . . the actual amounts incurred and realized by the specific exporter or producer being examined in the . . . review . . . ."). Therefore, the Court must examine, according to step two in the *Chevron* analysis, whether Commerce's implicit designation of Solvay & Cie as the "specific exporter" by basing the ratio on its consolidated financial records in this case was a reasonable interpretation of the statute and supported by substantial evidence. The Court finds that Commerce's use of consolidated financial data in this case is unreasonable and not supported by substantial evidence.

Commerce is obligated to rely upon methodologies which "reasonably reflect the costs associated with the production and sale of the merchandise," 19 U.S.C. § 1677b(f), and use the actual amounts incurred by the specific exporter being examined in the investigation when accounting for selling, general and administrative expenses. *See* 19 U.S.C. §1677b(e)(2)(A). This court has held that Commerce is to "determine as accurately as possible the true cost to the respondent of manufacturing the subject merchandise." *Timken Co. v. United States*, 18 CIT 1, 10, 852 F. Supp. 1040, 1049 (1994). In the case at hand, the record shows that Commerce possessed CBCC's financial records which showed a much higher actual ratio of financial expenses than the ratio obtained from the  consolidated financial records. *See* CBCC October 4 Deficiency Response at Exhibit 1, Prop. Doc. 9 (A.R. Fiche No. 52 at 27).

Commerce is justified in utilizing consolidated financial statements when corporate control, whether direct or indirect, exists. *See E.I. DuPont de Nemours & Co. v. United States*, Slip Op. 98-7 (CIT Jan. 29, 1998). *See also* ARB 51, as amended by FAS 94. Commerce is nevertheless obligated to fulfill the clear intent of the statute, i.e., to determine true costs of the specific exporter. When, as here, there is evidence on the record from which to determine the actual ratio of financial expenses

for COP and CV purposes, Commerce may not ignore that ratio in favor of a ratio found from consolidated statements. Commerce is statutorily mandated to utilize the ratio which will more accurately reflect actual costs incurred -- especially in this case, where there is no evidence of intercompany borrowing or other indicia that Solvay & Cie determined CBCC's cost of money.[4]

Therefore, the Court remands to Commerce with instructions to calculate CBCC's financial expenses based upon CBCC's own 1995 financial statements and to recalculate COP using the new ratio.

## V.   CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's Motion in part, denies it in part, and remands. An order will be entered accordingly.

Dated: September 1, 1999
        New York, NY

_____
Judith M. Barzilay
Judge

---

[4]In *American Silicon Technologies v. United States*, No. 99-34, 1999 WL 354415 (CIT Apr. 9, 1999), this court remanded to Commerce to recalculate CBCC's financial expenses using the consolidated financial statements of CBCC and its immediate parent, Solvay do Brasil, instead of the consolidated statements of Solvay & Cie. There was record evidence of financial activity between CBCC and Solvay do Brasil. *Id.* at * 8.