E.I. DUPONT DE NEMOURS & COMPANY, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

Aramid Products V.o.F. and Akzo Nobel Aramid Products Inc., Defendants–Appellees.

No. 00–1100.

United States Court of Appeals, Federal Circuit.

Feb. 12, 2001.

Before MAYER, Chief Judge, RADER and BRYSON, Circuit Judges.

RADER, Circuit Judge.

The United States Court of International Trade sustained the United States Department of Commerce's Final Results in an administrative review of an antidump-ing order for PPD–T aramid fibers imported from the Netherlands by Aramid Products V.o.F. (Aramid) and Okzo Nobel Aramid Products Inc. *E.I. DuPont de Nemours & Co. v. United States*, No. 97–08–01335, 1999 WL 378258 (C.I.T. June 2, 1999) (*DuPont II*). The Court of International Trade later sustained Commerce's remand results. *E.I. DuPont de Nemours & Co. v. United States*, No. 97–08–01335, 1999 WL 642408 (C.I.T. Aug. 17, 1999) (*DuPont III*). Because the Court of International Trade correctly sustained Commerce's Final Results, this court *affirms*.

I.

Aramid, a Dutch company, produces the PPD–T aramid fibers at issue, and Akzo Nobel Aramid Products Inc., a United States company, sells those fibers in the United States. Akzo Nobel Aramid Products Inc. is a wholly owned subsidiary of Akzo Nobel Inc., another United States company. Akzo Nobel Inc. is a wholly owned subsidiary of Akzo Nobel N.V., a Dutch company that is also Aramid's corporate parent. The following chart shows the relationship between these companies:

In 1994, Akzo Nobel N.V. increased its holding in Aramid from 50% to 95%. *E.I. DuPont de Nemours & Co. v. United States*, No. 96–11–02509, 1998 WL 42598, at *1 (Ct. Int'l Trade Jan. 29, 1998) (*DuPont I*). In exchange for this increased equity interest, Akzo Nobel N.V. extin-guished its outstanding loans to Aramid. *Id.* Under generally accepted Dutch accounting principles, Akzo Nobel N.V. then consolidated Aramid's operating results for financial reporting purposes. *Id.* In subsequent reporting to Commerce, Akzo Nobel N.V. submitted accounting of amortized

goodwill for this transaction, including (1) write-down of fixed assets, (2) write-off of obsolete inventory and waste disposal, (3) write-down of beginning inventory, and (4) residual goodwill. *Id.* at *5.

In 1994, Commerce published its initial antidumping duty order for PPD–T aramid fibers from the Netherlands. This 1994 order did not cover the time including or subsequent to the Akzo group's corporate restructuring. Commerce conducted a first antidumping duty administrative review, which the Court of International Trade sustained over E.I. DuPont de Nemours & Company's challenges. *Id.* at *14.

Commerce initiated a second antidumping administrative review covering the period from June 1, 1995 through May 31, 1996. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 61 Fed. Reg. 41,373 (Dep't Commerce Aug. 8, 1996). In 1997, Commerce issued its Final Results of the second administrative review. Aramid Fiber Formed of Poly Para–Phenylene Terephthalamide from the Netherlands; Final Results of Antidumping Administrative Review, 62 Fed. Reg. 38,058 (Dep't Commerce July 16, 1997) (Final Results). DuPont filed an action in the Court of International Trade, challenging several of Commerce's findings, including calculating interest expenses with consolidated group financial statements and excluding residual goodwill from the cost of production. The Court of International Trade sustained Commerce's Final Results in part, adopting the reasoning of *DuPont I*, and remanded in part. *DuPont II*, 1999 WL 378258, at *5. The Court of International Trade later sustained Commerce's remand results. *DuPont I*, 1998 WL 42598, at *14. DuPont appeals. This court has jurisdiction under 28 U.S.C. § 1295(a)(5) (1994).

## II.

The Court of International Trade reviews Commerce's decision to determine whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994 & Supp. IV 1998). This court reapplies the Court of International Trade's standard of review to Commerce's determination. *Cemex S.A. v. United States*, 133 F.3d 897, 900 (Fed.Cir. 1998).

### A.

■ DuPont challenges Commerce's use of Akzo Nobel N.V.'s consolidated financial statements, rather than Aramid's individual financial statements, to calculate the interest expense factor for cost of production. DuPont asserts that Commerce's use of consolidated financial statements contravenes Congressional intent and does not reflect Aramid's actual costs. DuPont also challenges Commerce's use of Akzo Nobel Inc.'s consolidated financial statements, rather than Akzo Nobel Aramid Products Inc.'s individual financial statements, to calculate the interest expense factor for indirect selling expense.

If a statute unambiguously expresses the intent of Congress on an issue, this court and the agency must give effect to that intent. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the adminis-

trator of an agency." *Id.* at 844, 104 S.Ct. 2778.

The 1994 Uruguay Round Agreements Act (URAA) added 19 U.S.C. § 1677b(f)(1)(A) (1994 & Supp. IV 1998), which governs Commerce's determination of financing costs for calculating the cost of production. Section 1677b(f)(1)(A) states:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer....

Accordingly, Commerce should normally use the records of the individual exporter or producer of the merchandise. However, this direction to use the records of the specific exporter or producer is not absolute. Commerce should only use those records if they "reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* The statute is silent on whether the interest expenses of the exporter or producer "reasonably reflect" the actual costs of production where the exporter or producer is part of a consolidated group of companies under the control of a single member. Accordingly, this court must determine the reasonableness of Commerce's interpretation of § 1677b(f)(1)(A).

Before Congress passed the URAA, Commerce calculated interest expense factors with consolidated group financial statements when a single member controlled the group at issue. Commerce set forth the reasoning underlying this practice in its Final Results. Commerce reasoned that capital resources (debt and equity) within a consolidated group of companies are fungible, and the controlling member of the group has the ability to dictate the capital structure of each member of the group. *Final Results,* 62 Fed. Reg. at 38,060. In other words, the controlling member of the group can change the amount of debt held by any company within the group (and thus the amount of interest expense incurred by such company) by exchanging debt and equity. In such a group, the individual company's interest expense represents the amount determined by the controlling member, not necessarily the interest expense actually incurred in producing the merchandise. Using consolidated financial statements prevents the controlling member from shifting interest expenses away from the calculated cost of production.

This court recognizes that an interest expense factor of a consolidated group is more likely to include interest expenses associated with producing products other than those subject to the antidumping order. However, the drawback to using individual financial statements discussed above counters the potential disadvantages of relying on consolidated financial statements. Commerce is best suited to weigh such drawbacks. Commerce's determination that individual financial statements do not reasonably reflect the costs associated with the production and sale of the merchandise, where a member controls the group and capital resources within the group are fungible, is a reasonable interpretation of § 1677b(f)(1)(A).

The statutes governing Commerce's calculation of indirect selling expense do not

include a statutory provision such as § 1677b(f)(1)(A). Accordingly, this court owes even more deference to Commerce's decision to consolidate financial statements to determine the interest expense factor for indirect selling expenses. The cost of production analysis above thus applies equally to Commerce's use of consolidated financial statements to calculate the interest expense factor for the indirect selling expense.

The Court of International Trade has in other cases ruled that Commerce could not rely on consolidated financial statements to calculate interest expense factors. *AIMCOR v. United States*, 69 F.Supp.2d 1345, 1354 (C.I.T. 1999); *American Silicon Technologies v. United States*, No. 97–02–00267, Slip Op. 99–34, 1999 WL 354415 at *8 (C.I.T. April 9, 1999), (dealing with the same companies as in *AIMCOR*). In both of these cases, however, the Court of International Trade relied on the absence of intercompany borrowing. *AIMCOR*, 69 F.Supp.2d at 1354; *Am. Silicon*, 1999 WL 354415, at *8. An absence of intercompany borrowing within a particular group of companies shows that the group does not treat debt and equity as fungible. Thus, Commerce's reason for using consolidated financial statements does not apply to such groups. In those instances, the individual financial statements will more accurately reflect the actual financing costs of producing and exporting the subject merchandise. The reasoning of those other Court of International Trade decisions thus does not apply in the face of intercompany borrowing.

Commerce used the consolidated financial statements of one corporate parent, Akzo Nobel N.V., to calculate the interest expense factor for cost of production, and another corporate parent, Akzo Nobel Inc., to calculate the interest expense factor for indirect selling expense. Substantial evi-

dence in the record supports the finding that Akzo Nobel N.V. loaned money to Aramid, and that Akzo Nobel N.V. controls the Akzo group of companies. Substantial evidence in the record also supports the finding that Akzo Nobel Inc. borrows money on behalf of all Akzo-related companies within the United States, and that Akzo Nobel Inc. controls that group of companies. Thus, substantial evidence supports Commerce's decision to use Akzo Nobel N.V.'s consolidated financial statements to calculate the interest expense factor for cost of production and to use Akzo Nobel Inc.'s consolidated financial statements to calculate the interest expense factor for indirect selling expense.

### B.

DuPont also challenges Commerce's decision to exclude residual goodwill from the cost of production analysis. Residual goodwill is the difference between the value of Aramid's debt forgiven by Akzo Nobel N.V. and the appropriate net book value of the Aramid assets acquired. After the exchange, Aramid no longer accounted for the corresponding interest expenses associated with the loans from Akzo Nobel N.V., even though those loans presumably financed Aramid's production of PPD–T aramid fibers.

■ The extinguished debt shows Akzo Nobel N.V.'s ability to exchange debt for equity within the Akzo group. Commerce in its discretion has chosen to address this issue by relying on Akzo Nobel N.V.'s consolidated financial statements to calculate Aramid's interest expense factor for cost of production, as discussed above. Akzo Nobel N.V. did not extinguish the debt from the entire Akzo group of companies; it only shifted debt away from Aramid. Thus, if Commerce included an amortized portion of the residual goodwill in Aramid's cost of production, Commerce

would be counting the interest expense associated with the residual goodwill twice. Accordingly, substantial evidence supports Commerce's decision to exclude residual goodwill from the cost of production calculation.

Because Commerce reasonably interpreted § 1677b(f)(1)(A), because substantial evidence supports Commerce's reliance on consolidated group financial statements to calculate cost of production and indirect selling expense in this case, and because substantial evidence supports Commerce's exclusion of residual goodwill from its cost of production calculation, this court affirms the Court of International Trade's decision.