133 F.3d 897
 19 ITRD 2025
 CEMEX, S.A., Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee,
and
The Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray
Portland Cement and National Cement Company of
California, Inc., Defendants-Appellees.
 No. 97-1151.
 United States Court of Appeals,
Federal Circuit.
 Jan. 8, 1998.
 
 Irwin P. Altschuler, Manatt, Phelps, & Phillips, Washington, DC, argued for Plaintiff-Appellant. With him on the brief were David R. Amerine, Thomas P. Ondeck, and Ronald M. Wisla.
 Lucius B. Lau, Trial Attorney, Commercial Litigation, Civil Division, U.S. Department of Justice, Washington, DC, argued for Defendant-Appellee. On the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Cynthia B. Schultz, Attorney. Of counsel were Stephen J. Powell, Chief Counsel for Import Administration, and Berniece A. Browne, Chief, Antidumping Litigation, and Duane W. Layton, Senior Counsel for NAFTA Affairs, U.S. Department of Commerce, Washington, DC.
 Joseph W. Dorn, King & Spalding, Washington, DC, argued for Defendants-Appellees. With him on the brief were Michael P. Mabile, and Stephen A. Jones. Of counsel was Martin M. McNerney.
 Before NEWMAN, PLAGER, and CLEVENGER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 This is an appeal from a United States Court of International Trade ("CIT") decision sustaining, after two remands, the results of a final administrative review of an antidumping duty order issued by the U.S. Department of Commerce ("Commerce") against CEMEX. CEMEX argues that Commerce misinterpreted several sections of the antidumping laws and, consequently, erred in computing the dumping margin. In addition, CEMEX contends that, in remanding to Commerce for the correction of an error in the computer program that calculated the dumping margin, the CIT abused its discretion. On the contrary, Commerce's legal conclusions were correct, and its factual determinations were supported by substantial evidence. Furthermore, the CIT acted within its discretion in granting the remand to correct the computer program error. We therefore affirm.
 
 
 2
 * Pursuant to the antidumping laws, Commerce must impose duties on imported products sold, or likely to be sold, in the United States at less than their fair value if such sales harm, or pose the potential to harm, domestic industry. See 19 U.S.C. § 1673 (1988)[1]; Zenith Electronics Corp. v. United States, 77 F.3d 426, 428 (Fed.Cir.1996). The amount of such duties, known as the dumping margin, is equal to the "amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673. Commerce may calculate the United States price and the foreign market value on several alternative bases. See Zenith Elecs., 77 F.3d at 428. The United States price is calculated as the more appropriate of either the United States "purchase price" or the "exporter's sales price." 19 U.S.C. § 1677a(a). Foreign market value is based on the prices of home market sales that are made in the ordinary course of trade, third country sales, or constructed value as appropriate, see 19 U.S.C. § 1677b, although home market sales are preferred, see Smith-Corona Group v. United States, 713 F.2d 1568, 1572-73, 1 Fed. Cir. (T) 130, 133-34 (1983). To ensure that dumping duties are calculated fairly, foreign market value and United States price are subject to various adjustments to achieve a common basis for comparing prices. See, e.g., 19 U.S.C. § 1677b(a)(4); NSK Ltd. v. United States, 115 F.3d 965, 969 (Fed.Cir.1997). Commerce compares these two adjusted values and imposes an antidumping duty in the amount by which foreign market value exceeds the United States price. See 19 U.S.C. § 1673.
 
 
 3
 CEMEX is a Mexican manufacturer and exporter of gray portland cement, the primary binding agent of concrete. Among other products, CEMEX manufactures Type I cement, Type II cement, and Type V cement. It sells Types II and V cements in the United States and Types I, II, and V cements in Mexico. On August 30, 1990, Commerce issued an antidumping duty order against CEMEX, Gray Portland Cement and Clinker from Mexico, 55 Fed.Reg. 35,443 (1990), because it determined that CEMEX was selling gray portland cement (Types II and V cements) in the United States at less than fair value. See id. Commerce issued the final results of the review of this order on September 8, 1993. See Gray Portland Cement and Clinker from Mexico, 58 Fed.Reg. 47,253 (1993). In this review, Commerce based foreign market value on the constructed value of Types II and V cements, because it found that sales of these products in Mexico, the home market, were outside the ordinary course of trade. See id. at 47,255. CEMEX and the Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement and National Cement Company of California ("Ad Hoc Committee") challenged the final results of the administrative review.
 
 
 4
 Although the CIT affirmed Commerce's determination that the home market sales of Types II and V cements were outside the ordinary course of trade, it remanded to Commerce and ordered it to request and consider data to determine whether home market sales of Type I cement were suitable for comparison to U.S. sales of Types II and V cements in order to compute foreign market value. See CEMEX S.A. v. United States, No. 95-72, 1995 WL 251561, slip op. at 31 (Ct. Int'l Trade Apr. 24, 1995).
 
 
 5
 Commerce collected this data and determined that Type I cement was sufficiently similar to Types II and V cements to allow for a comparison between U.S. sales of Types II and V cements and Mexican sales of Type I cement. Therefore, to arrive at the dumping margin, Commerce based foreign market value on this price-to-price comparison rather than the constructed value of Types II and V cements. In addition, citing CEMEX's unwillingness or inability to comply fully with its requests for information, Commerce, in computing the difference in merchandise adjustment for foreign market value, utilized a twenty percent upward adjustment as best information available. See 19 U.S.C. § 1677e(c). This adjustment increased foreign market value significantly, which in turn increased the dumping margin. See 19 U.S.C. §§ 1677b(a)(4)(c), 1673.
 
 
 6
 On appeal, the CIT affirmed Commerce's decision but remanded again for the correction of an error in the computer program that was used to calculate the dumping margin. See CEMEX S.A. v. United States, No. 96-132, 1996 WL 467731, slip op. at 9, 22-24 (Ct. Int'l Trade Aug. 13, 1996). On remand, Commerce corrected the error, and the CIT sustained the results, CEMEX S.A. v. United States, No. 96-170, 1996 WL 625055, slip op. at 1 (Ct. Int'l Trade Oct. 24, 1996).
 
 
 7
 CEMEX took this appeal arguing that: (1) no substantial evidence supported Commerce's determination that home market sales of Types II and V cements were not in the ordinary course of trade; (2) even if the sales of Types II and V cements were not in the ordinary course of trade, Commerce was obliged to use constructed value of Types II and V cements, rather than a price-to-price comparison with Type I cement, to determine foreign market value; (3) Commerce erred in utilizing best information available in order to compute the difference in merchandise adjustment; and (4) the CIT abused its discretion in remanding to Commerce for the correction of the error in the computer program.
 
 II
 
 8
 In reviewing the final results of Commerce's administrative review, the CIT is required to sustain "any determination, finding, or conclusion" made by Commerce unless it was "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1). To determine whether the CIT correctly applied its standard of review in reaching its decision, this court must apply anew the statute's express standard of review to the agency's determination. See NEC Home Elecs., Ltd. v. United States, 54 F.3d 736, 742 (Fed.Cir.1995). That means that we test the underlying findings of Commerce to determine if they are supported by substantial evidence. See Fujitsu Gen. Ltd. v. United States., 88 F.3d 1034, 1038 (Fed.Cir.1996). We review the CIT's interpretation of the antidumping laws de novo. See id.
 
 Ordinary Course of Trade
 
 9
 The antidumping duty is "an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673. Foreign market value is "the price, at the time such merchandise is first sold within the United States ... at which such or similar merchandise is sold ... in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption...." 19 U.S.C. § 1677b(a)(1). The term "ordinary course of trade" means "the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). Thus, for home market sales of a product to be utilized in calculating the dumping margin, the sales must be in the ordinary course of trade.
 
 
 10
 Commerce determined that sales of Types II and V cements in Mexico were outside the ordinary course of trade and excluded them in favor of Type I cement in computing the dumping margin. CEMEX contends that Commerce erred in concluding that CEMEX's sales of Types II and V cements in Mexico were outside the ordinary course of trade.
 
 
 11
 Determining whether home market sales are in the ordinary course of trade is a question of fact. Commerce must evaluate not just "one factor taken in isolation but rather ... all the circumstances particular to the sales in question." Murata Mfg. Co. v. United States, 820 F.Supp. 603, 607 (Ct. Int'l Trade 1993). An analysis of these factors should be guided by the purpose of the ordinary course of trade provision which is "to prevent dumping margins from being based on sales which are not representative" of the home market. Monsanto Co. v. United States, 698 F.Supp. 275, 278 (Ct. Int'l Trade 1988). Our task, then, is to discern whether Commerce's determination that the sales of Types II and V cements in Mexico were not in the ordinary course of trade was supported by substantial evidence.
 
 
 12
 CEMEX argues that Commerce failed to take into account all relevant record evidence and the totality of the circumstances surrounding its home market sales of Types II and V cements when Commerce determined that they were outside the ordinary course of trade. Nevertheless, Commerce did examine several probative factors. First, Commerce noted that Types II and V cements are specialty cements that were sold to a niche market. These sales represent a minuscule percentage of CEMEX's total sales of cement, a fact that indicates that they were not in the ordinary course of trade. See Mantex v. United States, 841 F.Supp. 1290, 1307-08 (Ct. Int'l Trade 1993).
 
 
 13
 Further, Commerce found that the shipping arrangements for home market sales of Types II and V cements were not ordinary. In Mexico, industry practice is to limit the distance that cement is shipped from the point of manufacture. In fact, more than ninety-five percent of cement shipments in Mexico fall within a radius of 150 miles from the point of manufacture. During the period of review, however, CEMEX shipped Types II and V cements for the domestic market over considerably greater distances and absorbed much of the freight costs for these longer shipments. CEMEX's shipping arrangements departed significantly from the standard industry practice in Mexico; this departure from the norm could well give rise to Commerce's determination that the sales of Types II and V cements were outside the ordinary course of trade.
 
 
 14
 In addition, because CEMEX was absorbing extraordinary freight costs for home market sales of Types II and V cements, its profit margin on these types was significantly lower than its profits on other cement types for which large shipping costs were not incurred. "[A] profit level comparison is probative of the economic reality" of the sales, Mantex, 841 F.Supp. at 1308, and therefore the disparity in profit margins is indicative of sales that were not in the ordinary course of trade.
 
 
 15
 Finally, evidence before Commerce indicated that the home market sales of Types II and V cements were of a promotional nature; customers of Types II and V cements were more likely to purchase CEMEX's other cement products. The promotional quality of the sales of Types II and V cements, according to Commerce, differentiated them from CEMEX's other products and therefore rendered them outside the ordinary course of trade. See Gray Portland Cement and Clinker from Mexico, 58 Fed.Reg. at 47,255.
 
 
 16
 Although CEMEX does not dispute any of the factors upon which Commerce based its conclusion regarding Types II and V cements, CEMEX claims that Commerce undertook only a selective analysis of the administrative record and failed to consider several important factors. For example, CEMEX notes that Types II and V cements were not obsolete or defective merchandise, see Monsanto, 698 F.Supp. at 278, but were standard grade products containing no unusual specifications, which indicates that the sales were in the ordinary course of trade, see Polyvinyl Alcohol from Taiwan, 61 Fed.Reg. 14,064, 14,068 (1996). Further, the cement was not export overrun merchandise, but was sold pursuant to existing home market demand, another factor that CEMEX claims points toward an ordinary course of sale transaction. CEMEX also contends that Commerce should have considered that its sales of Types II and V cements, as well as profits derived therefrom, were significant in absolute terms even if in relative terms they represented only a fraction of CEMEX's domestic cement business. Finally, CEMEX argues that the sales of Types II and V cements were not made under unusual circumstances or subject to special agreements which, if shown, would indicate that the sales were outside the ordinary course of trade. See Sulfur Dyes from the United Kingdom, 58 Fed Reg. 3253, 3256 (1993) (stating that because sale was outside the norm in price and quantity and was subject to a special agreement, it was therefore outside the ordinary course of trade). CEMEX explains the unusual shipping arrangement of Types II and V cements by noting that it absorbs shipping costs for its other products. Therefore, according to CEMEX, absorbing shipping costs for Types II and V cements was not unusual.
 
 
 17
 Although the factors listed by CEMEX are perhaps probative of whether the home market sales of Types II and V cements were in the ordinary course of trade and worthy of consideration, Commerce needs only support its ordinary course of trade determination by substantial evidence. It is clear to us that Commerce's decision that the sales of Types II and V cements were outside the ordinary course of trade was supported by substantial evidence.
 
 Constructed Value
 
 18
 Upon finding that the sales of Types II and V cements in Mexico were outside the ordinary course of trade and thus ineligible as the basis for computing the dumping margin, Commerce initially utilized the formula for constructed value under section 1677b(e) to arrive at foreign market value for Types II and V cements. Commerce may use constructed value to compute the dumping margin if it determines that the foreign market value of the imported merchandise cannot be determined. See 19 U.S.C. § 1677b(a)(2). Here, Commerce used constructed value rather than the price of Type I cement sold in Mexico because it had not requested, and CEMEX had not provided, information that would permit an accurate comparison of home market sales of Type I cement to U.S. sales of Types II and V cements.
 
 
 19
 Noting the statutory preference for the use of similar merchandise in determining foreign market value, see NTN Bearing Corp. v. United States, 747 F.Supp. 726, 735 (Ct. Int'l Trade 1990), the CIT remanded to Commerce and ordered it to request difference in merchandise data from CEMEX to determine whether Mexican sales of Type I cement were suitable for comparison to U.S. sales of Types II and V cements. See CEMEX, S.A. v. United States, No. 95-72, 1995 WL 251561, slip op. at 26 (Ct. Int'l Trade Apr. 24, 1995). Commerce collected this data, to the extent that CEMEX supplied it, and determined that Type I cement was similar to Types II and V cements and thus based its determination of foreign market value for Types II and V cements on the price of Type I cement sold in Mexico.
 
 
 20
 CEMEX argues that, even if Commerce were correct to exclude sales of Types II and V cements as outside the ordinary course of trade, Commerce's only option upon excluding these sales would be to utilize the constructed value for Types II and V cements as the basis for foreign market value. The United States and the Ad Hoc Committee entreat us to ignore CEMEX's argument because CEMEX failed to raise it before the CIT. Ordinarily, when a party fails to make an argument in proceedings below, the argument is waived, and we will not hear it on appeal. See, e.g., Frank v. Department of Transp., 35 F.3d 1554, 1559 (Fed.Cir.1994). However, because an issue of statutory interpretation is involved, we address CEMEX's argument. See, e.g., L.E.A. Dynatech, Inc. v. Allina, 49 F.3d 1527, 1531 (Fed.Cir.1995) (stating that an appellate court may consider an argument not raised before the trial court if it involves, among other things, "significant questions of general impact").
 
 
 21
 As previously stated, the antidumping margin is calculated by subtracting United States price from "foreign market value." 19 U.S.C. § 1673. "Foreign market value" is the price at which "such or similar merchandise" is sold in the home country in the ordinary course of trade. 19 U.S.C. § 1677b(a)(1).
 
 
 22
 Section 1677(16) sets up a hierarchy for identifying "such or similar merchandise."[2] Commerce examines each category in order, and once merchandise is presented that meets the criteria stated by a category, the price of this merchandise in the home country becomes the foreign market value. See 19 U.S.C. §§ 1677(16), 1677b(a)(1). The first class of merchandise is identical merchandise, the next class is nonidentical merchandise that is made by the same producer in the same country and is similar in value to the merchandise under investigation, and the third class is merchandise made by the same producer in the same country and used for the same purposes as the merchandise under investigation. See 19 U.S.C. § 1677(16).
 
 
 23
 CEMEX presents its own view of the manner in which Commerce should have applied these statutory sections. According to CEMEX's methodology for determining foreign market value, Commerce should first identify the appropriate category of "such or similar merchandise" as the basis for foreign market value. Next, opines CEMEX, Commerce should examine the sales of the identified merchandise to determine if they are in the ordinary course of trade. If Commerce were to find that the sales of the identified merchandise were outside the ordinary course of trade, Commerce would be precluded from making a determination of foreign market value under section 1677b(a)(1)(A), and therefore Commerce must base foreign market value on constructed value under section 1677b(a)(2). Commerce may not, asserts CEMEX, identify another class of merchandise as "such or similar merchandise" once the initially identified class is excluded as outside the ordinary course of trade. Rather, foreign market value must be based on constructed value. Applying CEMEX's methodology to the case at hand, Types II and V cements are identical to the class of merchandise under review and hence meet the first category under section 1677(16). Therefore, CEMEX contends that Commerce should have identified Types II and V cements as "such or similar merchandise." Next, according to CEMEX, Commerce should have examined sales of Types II and V cements to determine whether they were outside the ordinary course of trade. Upon determining that Types II and V cements were outside the ordinary course of trade, Commerce was obliged to base foreign market value on constructed value. Commerce was not free instead to identify Type I cement as "such or similar merchandise" which would become the basis of foreign market value.
 
 
 24
 In its analysis, CEMEX misreads the crucial words in section 1677(16) stating that "such or similar merchandise" means the first of the enumerated categories "in respect of which a determination for the purposes of part II of this subtitle can satisfactorily be made." 19 U.S.C. § 1677(16). Part II of this subtitle, entitled "Imposition of Antidumping Duties," includes the provision that establishes the antidumping duty to be the difference between foreign market value and United States price. 19 U.S.C. § 1673. A determination of the dumping margin cannot be made if sales of a product which are to be relied upon in reaching foreign market value are not in the ordinary course of trade. See 19 U.S.C. §§ 1677b(a)(1), 1673. Therefore, the initial consideration for Commerce is whether, under section 1677b(a)(1), the sales are "in the usual commercial quantities and in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1). If the sales are not in the ordinary course of trade, then Commerce should exclude that specific class of merchandise (here, Types II and V cements) because a determination of the antidumping duty cannot be made. Commerce should then examine the next available class of merchandise (here, Type I cement) to determine if it matches any of the section 1667(16) categories of "such or similar merchandise." In this case, Type I cement meets the section 1677(16)(B) requirements because it is produced in the same country and by the same person as Types II and V cements, it is like Types II and V cements in composition, and it is approximately equal in commercial value to Types II and V cements. Therefore, Type I cement becomes the "such or similar merchandise" upon which foreign market value is based.
 
 
 25
 The plain language of the statute requires Commerce to base foreign market value on nonidentical but similar merchandise (here, Type I cement), rather than constructed value when sales of identical merchandise have been found to be outside the ordinary course of trade. Therefore, CEMEX's contention that Commerce erred in basing the foreign market value of Types II and V cements on Mexican sales of Type I cement is unfounded.
 
 Best Information Available
 
 26
 After the CIT remand, Commerce determined that Type I cement was similar merchandise suitable for comparison to U.S. sales of Types II and V cements. Commerce, therefore, in accordance with the statute and regulations, requested additional data concerning the appropriate adjustments to permit price-to-price comparisons. See 19 U.S.C. § 1677b(a)(4)(C); 19 C.F.R. § 353.57 (1992). Commerce attempted to obtain the appropriate information from CEMEX on three different occasions, and on each occasion, Commerce received only partial responses from CEMEX. Therefore, Commerce used "best information available" to calculate the difference in merchandise adjustment. Commerce is authorized to use best information available "whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required." 19 U.S.C. § 1677e(c). CEMEX argues that it did not produce the requested information because it was impossible to do so. CEMEX did not raise this argument below, but asserted only that it had submitted all the necessary data requested by Commerce. Because CEMEX failed to assert this argument before the CIT, it may not now raise it with this court absent exigent circumstances. See, e.g., L.E.A. Dynatech, 49 F.3d at 1531; Frank, 35 F.3d at 1559. In this instance, whether it was impossible for CEMEX to respond more fully to the requests for information is a factual issue on which the government and the Ad Hoc Committee had no opportunity to comment because CEMEX did not raise the issue before the CIT. It is not for us to resolve such factual issues for the first time on appeal.
 
 Difference in Merchandise Adjustment
 
 27
 CEMEX next argues that Commerce's selection of twenty percent of manufacturing costs as an upward adjustment to foreign market value was not supported by substantial evidence. However, because CEMEX did not provide complete information, it cannot demonstrate that the twenty percent adjustment was in error. Given the purpose of the provision allowing for the use of best information available, see 19 U.S.C. § 1677e(c), which is to establish an incentive to respondents to provide complete and accurate responses to Commerce's request for information, see Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571, 8 Fed. Cir. (T) 69, 76 (1990), the adjustment by Commerce was appropriate and supported by substantial evidence.
 
 Remand for Correction of a Clerical Error
 
 28
 During the first remand proceeding before the CIT, the Ad Hoc Committee discovered an error in Commerce's calculation of United States price. Commerce had inadvertently failed to deduct freight expenses from United States price, and this resulted in a lower dumping margin for CEMEX. The CIT agreed with Commerce and the Ad Hoc Committee that the error was undiscoverable until after Commerce published its final results. Because the CIT was remanding the case to Commerce for freight expense adjustments, it also allowed a remand to rectify the clerical error. Given that the CIT found the error to be undiscoverable prior to the remand, it acted within its discretion in allowing the error to be corrected in a subsequent remand. See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed.Cir.1995) (stating that a remand to correct clerical errors is especially appropriate where the CIT is already remanding for other reasons).
 
 
 29
 Furthermore, the remand for correction of the error was not improper merely because the Ad Hoc Committee did not exhaust its administrative remedies. Exhaustion of remedies is required only "where appropriate," 28 U.S.C. § 2637(d) (1994), and "where Congress has not clearly required exhaustion, sound judicial discretion governs," McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992). Here, Congress has not required exhaustion, and we cannot say that the CIT abused its discretion by remanding for correction of the error without requiring the Ad Hoc Committee to exhaust its administrative remedies.
 
 
 30
 We have considered CEMEX's other arguments and find them to be without merit. Thus, for the reasons stated above, we affirm the judgment of the CIT.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 Effective January 1, 1995, the Uruguay Round Amendments Act, Pub. Law No. 103-465, 108 Stat. 4809 (1994) ("URAA"), amended the antidumping laws. The URAA, however, does not apply to administrative reviews that were initiated before January 1, 1995. See URAA § 291(c)(2)(b); Zenith Electronics Corp. v. United States, 77 F.3d 426, 428 n. 1 (Fed.Cir.1996). Because the review in this case was initiated prior to January 1, 1995, all citations herein refer to the pre-URAA code
 
 
 [2]
 "Such or similar merchandise" is:
 [m]erchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
 (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
 (B) Merchandise--
 (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
 (ii) like that merchandise in component material or materials and in the purposes for which used, and
 (iii) approximately equal in commercial value to that merchandise.
 (C) Merchandise--
 (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
 (ii) like that merchandise in the purposes for which used, and
 (iii) which the administering authority determines may reasonably be compared with that merchandise.
 19 U.S.C. § 1677(16).