**Slip Op. 00-94**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

```
_____
                                    :
RHP BEARINGS LTD., NSK BEARINGS     :
EUROPE LTD. and NSK CORPORATION;    :
THE BARDEN CORPORATION (U.K.) LTD., :
THE BARDEN CORPORATION,             :
FAG BEARINGS CORPORATION,           :
                                    :
          Plaintiffs,               :
                                    :
          v.                        :     Consol. Court No.
                                    :     97-11-01983
UNITED STATES,                      :
                                    :
          Defendant,                :
                                    :
THE TORRINGTON COMPANY,             :
                                    :
          Defendant-Intervenor.     :
_____ :
```

Plaintiffs, RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively "RHP-NSK"), The Barden Corporation (U.K.) Ltd., The Barden Corporation and FAG Bearings Corporation (collectively "Barden-FAG") move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 61,963 (Nov. 20, 1997).

Specifically, RHP-NSK claims that Commerce erred in: (1) deducting United States repacking expenses as direct selling expenses; (2) calculating profit for constructed value ("CV"); (3) denying a partial, price-based level of trade adjustment to normal value; and (4) conducting a duty absorption inquiry for the subject review.

Barden-FAG claims that Commerce erred in: (1) calculating profit for CV; (2) failing to match United States sales to "similar" home market sales prior to resorting to CV when all home market sales of identical merchandise have been disregarded; (3) conducting a duty absorption inquiry for the subject review; and (4) conducting a below-cost sales test and disregarding certain home market sales pursuant to the results of this test.

**Held:** RHP-NSK's USCIT 56.2 motion is granted in part and denied in part. Barden-FAG's USCIT R. 56.2 motion is granted in part and denied in part. This case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty absorption inquiries conducted for this review; (2) match Barden-FAG's United States sales to similar home market sales before resorting to CV; and (3) recalculate Barden-FAG's dumping margin without regard to the results of the below-cost test. Commerce is affirmed in all other respects.

[RHP-NSK's motion is granted in part and denied in part. Barden-FAG's motion is granted in part and denied in part. Case remanded.]

Dated: August 3, 2000

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for RHP-NSK.

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Max F. Schutzman, Andrew B. Schroth and Mark E. Pardo) for Barden-FAG.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Stacy J. Ettinger, Patrick V. Gallagher, Myles S. Getlan and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for The Torrington Company.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs, RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively "RHP-NSK"), The Barden Corporation (U.K.) Ltd., The Barden Corporation and FAG Bearings Corporation (collectively "Barden-FAG") move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews ("Amended Final Results"), 62 Fed. Reg. 61,963 (Nov. 20, 1997).

Specifically, RHP-NSK claims that Commerce erred in: (1) deducting United States repacking expenses as direct selling expenses; (2) calculating profit for constructed value ("CV"); (3) denying a partial, price-based level of trade ("LOT") adjustment to normal value ("NV"); and (4) conducting a duty absorption inquiry

for the subject review.

Barden-FAG claims that Commerce erred in: (1) calculating profit for CV; (2) failing to match United States sales to "similar" home market sales prior to resorting to CV when all home market sales of identical merchandise have been disregarded; (3) conducting a duty absorption inquiry for the subject review; and (4) conducting a below-cost sales test and disregarding certain home market sales pursuant to the results of this test.

### BACKGROUND

This case concerns the seventh review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported to the United States from the United Kingdom during the review period of May 1, 1995 through April 30, 1996.[1]  Commerce published the preliminary results of the subject review on June 10, 1997.  See <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Preliminary Results of Antidumping Duty Administrative</u>

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995).  <u>See</u> <u>Torrington Co. v. United States</u>, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

Reviews and Partial Termination of Administrative Reviews ("Preliminary Results"), 62 Fed. Reg. 31,566.  Commerce issued the Final Results on October 17, 1997, see Final Results, 62 Fed. Reg. at 54,043, and amended them on November 20, 1997, see Amended Final Results, 62 Fed. Reg. at 61,963.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

**STANDARD OF REVIEW**

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT ___, ___, Slip Op. 00-64, at 8-10 (June 5, 2000) (detailing Court's standard of review in antidumping proceedings).

**DISCUSSION**

**I.   Commerce's Treatment of RHP-NSK's United States Repacking Expenses as Direct Selling Expenses**

**A.   Background**

An antidumping duty is imposed upon imported merchandise when

(1) Commerce determines such merchandise is being dumped, that is, sold or likely to be sold in the United States at less than fair value, and (2) the International Trade Commission determines that an industry in the United States is materially injured or is threatened with material injury.  See 19 U.S.C. § 1673 (1994); 19 U.S.C. § 1677(34) (1994).  To determine in an investigation or an administrative review whether there is dumping, Commerce compares the price of the imported merchandise in the United States to the NV for the same or similar merchandise in the home market.  See 19 U.S.C. § 1677b (1994).  The price in the United States is calculated using either an export price ("EP") or constructed export price ("CEP").  See 19 U.S.C. § 1677a(a), (b) (1994).

The Statement of Administrative Action[2] ("SAA") accompanying the Uruguay Round Agreements Act ("URAA") clarifies that Commerce will classify the price of a United States sales transaction as an EP if "the first sale to an unaffiliated purchaser in the United

---

[2] The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. No. 103-316, at 656 (1994).  "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

States, or to an unaffiliated purchaser for export to the United States, is made by the producer or exporter in the home market prior to the date of importation." H.R. Doc. No. 103-316, at 822 (1994). On the other hand, "[i]f, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter," then Commerce will classify the price of a United States sales transaction as a CEP. Id.; 19 U.S.C. § 1677a(b).

Commerce then makes adjustments to the starting price used to establish EP or CEP by adding: (1) packing costs for shipment to the United States, if not already included in the price; (2) import duties which have been rebated or not collected due to exportation of the subject merchandise to the United States; and (3) certain countervailing duties if applicable. See 19 U.S.C. §1677a(c)(1)(A)-(C); SAA at 823. Also, for both EP and CEP, Commerce will reduce the starting price by the amount, if any, included in such price that is attributable to: "(1) transportation and other expenses, including warehousing expenses, incurred in bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States; and (2) . . . export taxes or other charges imposed by the exporting country." SAA at 823; see 19 U.S.C. §

1677a(c)(2)(A), (B).

Moreover, Commerce must reduce the price used to establish CEP by any of the following amounts associated with economic activities occurring in the United States: (1) commissions paid in "selling the subject merchandise in the United States"; (2) direct selling expenses, that is, "expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties"; (3) "any selling expenses that the seller pays on behalf of the purchaser" (assumptions); (4) indirect selling expenses, that is, any selling expenses not deducted under any of the first three categories of deductions; (5) certain expenses resulting from further manufacture or assembly (including additional material and labor) performed on the merchandise after its importation into the United States; and (6) profit allocated to the expenses described in categories (1) through (5). 19 U.S.C. § 1677a(d)(1)-(3); see SAA at 823-24.

In this case, RHP-NSK delivered the subject merchandise to unaffiliated customers in the United States from warehouses owned and operated by NSK Corporation. See RHP-NSK's Resp. to Sect. C Questionnaire, Investigation No. A-412-801, Admin. Rev. 5/1/95-4/30/96, at 49 (Sept. 10, 1996). RHP-NSK normally ships merchandise in its original containers from its United States warehouse, however, in some instances, it repacked the merchandise

to accommodate orders for smaller distributors.  See id.

For the price of the subject merchandise in the United States, Commerce used EP or CEP, as appropriate, and calculated such prices "based on the packed [free on board], [cost, insurance, and freight], or delivered price to unaffiliated purchasers in, or for exportation to, the United States." Preliminary Results, 62 Fed. Reg. at 31,569.  Commerce also made deductions for: (1) discounts and rebates; and (2) any movement expenses in accordance with 19 U.S.C. § 1677a(c)(2)(A).  See id.  In calculating CEP, Commerce made additional adjustments in accordance with § 1677a(d)(1)-(3) by: (1) "deducting selling expenses associated with economic activities occurring in the United States, including commissions, direct selling expenses, indirect selling expenses, and repacking expenses in the United States"; (2) "deduct[ing] the cost of any further manufacture or assembly," where appropriate; and (3) "adjust[ing] for profit allocated to these expenses." Id.  In particular, in adjusting CEP, Commerce deducted RHP-NSK's United States repacking expenses as direct selling expenses under § 1677a(d)(1)(B), rather than as moving expenses under § 1677a(c)(2)(A), because it determined that repacking "was performed on individual products in order to sell the merchandise to the unaffiliated customer in the United States. Presumably, if a respondent could have sold the merchandise without repacking it,

the respondent would have done so. Thus, it is an expense associated with selling the merchandise." Final Results, 62 Fed. Reg. at 54,067.

### B.    Contentions of the Parties

RHP-NSK argues, as it did in the Final Results, see id., that Commerce erred in deducting RHP-NSK's United States repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B). See RHP-NSK's Mem. Supp. Mot. J. Agency R. ("RHP-NSK's Mem.") at 12-14. According to RHP-NSK, the United States repacking constitutes an expense incident to bringing the subject merchandise from the original place of shipment in the United Kingdom to the place of delivery in the United States and, therefore, should have been (1) classified and deducted as an expense under § 1677a(c)(2)(A), and (2) excluded from the pool of selling expenses Commerce uses to determine CEP profit. See id.; 19 U.S.C. § 1677a(d)(3), (f)(2)(B) (calculating CEP profit based on the profit allocated to expenses described in § 1677a(d)(1)-(2)).

Specifically, RHP-NSK claims that § 1677a(c)(2)(A) is not limited to moving expenses, but includes expenses required for transporting the goods from RHP-NSK's United States warehouses into the hands of carriers for delivery to United States customers. See RHP-NSK's Reply Mem. Supp. Mot. J. Agency R. ("RHP-NSK's Reply") at

2. RHP-NSK asserts that the cost of United States repacking is such a § 1677a(c)(2)(A) expense because the goods cannot be transported unless RHP-NSK first breaks open the transpacific shipping packages, selects the specific items ordered and then repacks those items for shipment to the customer's United States location. See id. at 3-4. RHP-NSK clarifies that this result does not change simply because the United States repacking may be directly related to particular sales. See id. at 3. RHP-NSK notes that § 1677a(c)(2)(A) does not preclude the deduction of expenses directly related to a particular sale; rather, the statute includes "any additional costs, charges, or expenses," either direct or indirect, incident to bringing the subject merchandise from Japan to the United States customer. See id. (quoting § 1677a(c)(2)(A)). RHP-NSK contends, for instance, United States inland freight from its United States warehouse to United States unaffiliated customers, even though directly related to particular sales to such customers, nevertheless constitutes a § 1677a(c)(2)(A) expense. See id. Thus, RHP-NSK asserts that United States repacking expense should similarly be treated as § 1677a(c)(2)(A) expenses even though it may be directly related to particular sales. See id.

Finally, RHP-NSK claims that United States repacking does not otherwise meet the definitional criteria of § 1677a(d)(1)(B) direct

selling expenses such as credit expenses, guarantees and warranties.  See id.  RHP-NSK notes that such expenses assist in selling products, but do not involve transporting goods from the United Kingdom to the United States unaffiliated customer as do United States repacking expenses.  See id.; RHP-NSK's Mem. at 13.

Although agreeing with RHP-NSK's contention that United States inland freight (warehouse to customer) charges are clearly transportation expenses and thus deductible pursuant to § 1677a(c)(2)(A), Commerce responds, as it did in the Final Results, that RHP-NSK's United States repacking expenses bear no relationship to "moving the merchandise from one point to another," as established by the fact that the merchandise was moved from the exporting country to the United States prior to repacking." Def.'s Mem. in Partial Opp'n to Pls.' Mots. J. Agency R. ("Def.'s Mem.") at 39 (quoting Final Results, 62 Fed. Reg. at 54,067).  Commerce also contends that § 1677a(d)(1)(B) does not limit direct selling expenses deducted from CEP to credit expenses, guarantees or warranties; rather, the statute reduces CEP by the amount of any selling expenses which result, and bear a direct relationship to, selling expenses in the United States.  See id. at 39.  Since RHP-NSK's repacking "'was performed on individual products in order to sell the merchandise to the unaffiliated customer in the United States,'" Commerce asserts that it properly treated the repacking

expenses as direct selling expenses pursuant to § 1677a(d)(1)(B).
Id. (quoting Final Results, 62 Fed. Reg. at 54,067).

The Torrington Company ("Torrington") generally agrees with
Commerce's arguments. See Torrington's Resp. to Pls.' Mots. J.
Agency R. ("Torrington's Resp.") at 21-23. Torrington notes, as it
did in the Final Results, that RHP-NSK reported that it normally
does not require repacking for its United States sales, but
performed repacking "in order to sell the merchandise to the
unaffiliated customer in the United States." Id. at 22.
Torrington asserts that since RHP-NSK's response is consistent with
Commerce's treatment of RHP-NSK's repacking expenses as selling
rather than movement expenses, Commerce properly included RHP-NSK's
repacking expenses in its calculation of CEP profit. See id.

### C. Analysis

The Court finds that RHP-NSK's United States repacking
expenses were not incident to bringing the subject merchandise from
the original place of shipment in the United Kingdom to the place
of delivery in the United States. Rather, such expenses were
clearly direct selling expenses.

Direct selling expenses under § 1677a(d)(1)(B) are not limited
to credit expenses, guarantees and warranties, but include
"expenses which result from and bear a direct relationship to the

particular sale in question." SAA at 823 (defining direct selling expenses). In this case, the particular sales in question concerned orders for smaller distributors. Although RHP-NSK reported that it normally does not perform repacking for United States sales (that is, it usually ships merchandise from its United States warehouse in its original containers), RHP-NSK acknowledged that it did some repacking to accommodate orders for smaller distributors. See RHP-NSK's Resp. to Sect. C Questionnaire, Investigation No. A-412-801, Admin. Rev. 5/1/95-4/30/96, at 49 (Sept. 10, 1996). The Court finds, therefore, as Commerce did in the Final Results, that RHP-NSK's repacking is an "expense associated with selling the merchandise." 62 Fed. Reg. at 54,067.

Accordingly, the Court concludes that Commerce properly treated and deducted RHP-NSK's United States repacking expenses as direct selling expenses pursuant to § 1677a(d)(1)(B) rather than as transportation or other expenses pursuant to § 1677a(c)(2)(A).

## II. Commerce's CV Profit Calculation

Commerce applied the preferred method in 19 U.S.C. § 1677b(e)(2)(A) to calculate CV profit. Specifically, Commerce calculated an actual profit ratio for Barden-FAG and RHP-NSK. First, Commerce subtracted costs and expenses from the home market price in order to calculate the profit for each sale of the foreign

like product in the ordinary course of trade. Commerce then aggregated the profit for all sales at the same LOT and divided this profit by the exporter's or producer's aggregate cost totals for the same sales. See Def.'s Mem. at 12-13 (citing Preliminary Results, 62 Fed. Reg. at 31,571). In calculating CV profit, Commerce excluded below-cost sales. See Final Results, 62 Fed. Reg. at 54,063.


A.    **Contentions of the Parties**

Barden-FAG and RHP-NSK contend that Commerce acted contrary to the plain meaning of 19 U.S.C. § 1677b(e)(2)(A) in calculating CV profit on an aggregated "class or kind" basis while disregarding sales outside the ordinary course of trade. See Barden-FAG's Mem. Supp. Mot. J. Agency R. ("Barden-FAG's Mem.") at 5-11; RHP-NSK Mem. at 15-24. Plaintiffs maintain that the statute permits Commerce to use an aggregated CV profit calculation only if no below-cost sales are disregarded in the calculation. See id.

Commerce maintains that it applied a reasonable interpretation of § 1677b(e)(2)(A) and properly based CV profit on aggregate profit data of all foreign like products under consideration for NV while disregarding below-cost sales. See Def.'s Mem. at 11-22. Torrington generally agrees with Commerce's contentions. See Torrington's Resp. at 12-14.

**B.    Analysis**

In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court held, inter alia, that Commerce's CV profit methodology, which consists of using the aggregate data of all foreign like products under consideration for NV, is consistent with the antidumping statute.   Since Barden-FAG's and RHP-NSK's arguments and the methodology at issue in this case are practically identical to those presented in RHP Bearings, the Court adheres to its reasoning in RHP Bearings and, therefore, finds Commerce's CV profit methodology to be in accordance with law.   Furthermore, since the methodology in § 1677b(e)(2)(A) explicitly requires that only sales "in the ordinary course of trade" be included in the calculation,  and  below-cost  sales  that  were  disregarded  in determining NV are not part of the "ordinary course of trade," the exclusion of below-cost sales was appropriate.  See 19 U.S.C. §§ 1677(15), 1677b(b)(1).

**III. Commerce's Denial of a Partial, Price-based LOT Adjustment to NV for RHP-NSK's CEP Sales**

**A.    Background**

During this review, Commerce applied a CEP offset under 19 U.S.C. § 1677b(a)(7)(B) to NV for all of RHP-NSK's CEP sales.  See Antifriction Bearings from United Kingdom: NSK/RHP Bearings Ltd. (NSK/RHP) Preliminary Results Analysis Mem. Seventh Administrative

Review 5/1/95-4/30/96 (Mar. 28, 1997) (Case No. A-412-801) at 3. In reaching this result, Commerce first determined for RHP-NSK that there was one CEP LOT and two home market LOTs, and that the CEP LOT was not the same as either home market LOT. See id. Commerce found that "[b]ecause the home market levels of trade were different from the CEP level of trade, [it] could not match to sales at the same level of trade in the home market nor could [it] determine a level-of-trade adjustment based on NSK-RHP's home market sales." Id. Commerce also determined that there was "no other information that provides an appropriate basis for determining a level-of-trade adjustment." Id. For RHP-NSK's CEP sales, therefore, Commerce "determined NV at the same level of trade as the [United States] sale to the unaffiliated customer and made a CEP offset adjustment in accordance with" § 1677b(a)(7)(B). Id. Moreover, contrary to RHP-NSK's contentions, Commerce concluded that no provision of the antidumping statute provides for a "partial" LOT adjustment "between two home market [LOTs] where neither level is equivalent to the level of the [United States] sale." Final Results, 62 Fed. Reg. at 54,056-57.

### B.    Contentions of the Parties

RHP-NSK agrees with the manner in which Commerce determined the LOT of its CEP for NV transactions. See RHP-NSK's Mem. at 25. In particular, RHP-NSK agrees that Commerce properly used the CEP

as adjusted for § 1677a(d) expenses prior to its LOT analysis. RHP-NSK, however, argues that Commerce should have granted it a "partial," price-based LOT adjustment. See id. at 27.

RHP-NSK first notes that Commerce found two LOTs in the home market, one corresponding to original equipment manufacturers ("OEM") sales and the other to after market ("AM") sales. See id. at 27. RHP-NSK also agrees that when Commerce matched CEP sales to home market OEM sales, Commerce correctly applied a CEP offset because there was no basis for quantifying a price-based LOT adjustment for CEP to OEM NV matches. See id. Further, RHP-NSK agrees that "Commerce correctly concluded that there was no record information that would allow Commerce to quantify the downward price adjustment to adjust fully the AM NV [LOT] to the CEP [LOT]." Id. Nevertheless, RHP-NSK disagrees with Commerce's decision to apply a CEP offset when Commerce matched CEP sales to home market AM sales. In these situations, RHP-NSK argues that § 1677b(a)(7)(A) and the SAA direct Commerce to calculate a partial, price-based LOT adjustment to NV for CEP sales measured by the price differences between OEM and AM LOTs. See id. at 27-28.

RHP-NSK notes that the statute directs Commerce to adjust NV for any difference between CEP and NV "'wholly or partly'" due to a difference in LOT between CEP and NV. Id. at 27 (quoting § 1677b(a)(7)(A)). RHP-NSK also notes that § 1677b(a)(7)(B)

indicates a CEP offset should only be used in the total absence of price-based LOT adjustments.  See id. at 27-28.  Accordingly, RHP-NSK claims that since there was evidence for quantifying price differences between OEM and AM LOTs, Commerce's failure to calculate a price-based LOT adjustment that partly accounted for such LOT differences violated the plain language of § 1677b(a)(7)(A).  See RHP-NSK's Reply at 11-12.

Commerce argues that it properly denied a partial LOT adjustment and applied a CEP offset to NV for all of RHP-NSK's CEP transactions.  See id. at 40-46.  Contrary to RHP-NSK's reading of § 1677b(a)(7)(A), Commerce asserts that the statute only provides for a LOT price-based adjustment to NV based upon price differences in the home market between the CEP LOT and NV LOT when the differences can be quantified.  See id. at 43.  Commerce claims that the statute does not authorize a LOT price-based adjustment based upon different LOTs in the home market when the price difference between the CEP LOT sales and the home market LOT sales cannot be quantified.  See id.; see also Final Results, 62 Fed. Reg. at 54,057 (explaining that Commerce does not read into § 1677b(a)(7)(A)'s "wholly or partly" language the authority to make a LOT adjustment based on differences between two home market LOTs where neither level is equivalent to the level of the United States sale).  Commerce, therefore, asserts that since it reasonably

interpreted § 1677b(a)(7)(A), the Court should sustain its denial of a LOT adjustment and grant of a CEP offset for all of RHP-NSK's CEP transactions. See Def.'s Mem. at 46.

Torrington generally agrees with Commerce's positions, emphasizing that Commerce reasonably interpreted § 1677b(a)(7)(A) as not providing for a "partial" LOT adjustment as contended by RHP-NSK. See Torrington's Resp. at 23-24. Torrington further argues that even if § 1677b(a)(7)(A) permits a partial LOT adjustment, RHP-NSK nevertheless failed to submit record evidence to show entitlement to such an adjustment. See id. at 25-26. Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence. See id. at 26.

### C. Analysis

The Court notes that this issue has already been decided in NTN Bearing, 24 CIT at ___, Slip Op. 00-64, at 44. As this Court decided in NTN Bearing, Commerce's decision to deny RHP-NSK a partial, price-based LOT adjustment measured by price difference between home market OEM and AM sales was in accordance with law. There is no indication in § 1677b(a)(7)(A) that the pattern of price differences between two LOTs in the home market, absent a CEP LOT in the home market, justifies a LOT adjustment. Rather,

Commerce's interpretation of § 1677b(a)(7)(A) as only providing a LOT adjustment based upon price differences in the home market between the CEP LOT and the NV LOT was reasonable, especially in light of the existence of the CEP offset to cover situations such as those at issue here.

## IV. Commerce's Duty Absorption Inquiry

### A. Background

Title 19, United States Code, § 1675(a)(4) (1994) provides that during an administrative review initiated two or four years after the "publication" of an antidumping duty order, Commerce, if requested by a domestic interested party, "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter."[3] Section 1675(a)(4) further provides that Commerce shall notify the International Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider in conducting a five-year ("sunset") review under § 1675(c), and the ITC will take such findings into account in determining whether material injury is likely to continue or

---

[3] Subsection (a)(4) of 19 U.S.C. § 1675 was added to the antidumping law by the URAA in 1994. See Pub. L. No. 103-465, § 220, 108 Stat. 4809, 4860.

recur if an order were revoked under § 1675(c).  See 19 U.S.C. § 1675a(a)(1)(D) (1994).

On May 31, 1996 and July 9, 1996, Torrington requested that Commerce conduct a duty absorption inquiry pursuant to 19 U.S.C. § 1675(a)(4) with respect to various respondents, including Barden-FAG and RHP-NSK, to determine whether antidumping duties had been absorbed during the seventh review.  See Final Results, 62 Fed. Reg. at 54,075.

Accordingly, Commerce conducted an inquiry and found that duty absorption had occurred for the subject review.  See id. at 54,044.  In asserting authority to conduct a duty absorption inquiry under § 1675(a)(4), Commerce first explained that for "transition orders," as defined in § 1675(c)(6)(C) (that is, antidumping duty orders, inter alia, deemed issued on January 1, 1995), regulation 19 C.F.R. § 351.213(j)(2) (1997)[4] provides that

_____

[4] The full text of 19 C.F.R. § 351.213(j) (1997) provides:

(j) Absorption of antidumping duties.

   (1) During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an antidumping order under § 351.211, or a determination under § 351.218(d) (sunset review), the Secretary, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the

Commerce "will make a duty absorption determination, if requested, for any administrative review initiated in 1996 or 1998." Id. at 54,074. Commerce also noted that although the regulation did not bind it for this seventh AFB review, it constitutes a public statement of how Commerce construes § 1675(a)(4).[5] See id. Commerce concluded that (1) because the antidumping duty order on the AFBs in this case has been in effect since 1989, the order is a transition order pursuant to § 1675(c)(6)(C), and (2) since this review was initiated in 1996 and a request was made, Commerce had the authority to make a duty absorption inquiry for the seventh review. See id. at 54,075.

---

United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.

(2) For transition orders defined in section 751(c)(6) of the Act, the Secretary will apply paragraph (j)(1) of this section to any administrative review initiated in 1996 or 1998.

Id.

[5] Although 19 C.F.R. § 351.213(j) is indicative of Commerce's interpretation of the URAA, the regulation does not apply here because the administrative review in this case was initiated on June 20, 1996 pursuant to a request dated May 31, 1996. Commerce's regulations that were issued pursuant to the URAA apply only to "administrative reviews initiated on the basis of requests made on or after the first day of July, 1997." 19 CFR Parts 351 et al., Antidumping Duties; Countervailing Duties; Final [R]ule, 62 Fed. Reg. 27,296, 27,416-17 (May 19, 1997).

**B.    Contentions of the Parties**

Barden-FAG and RHP-NSK argue that Commerce lacked authority under § 1675(a)(4) to conduct a duty absorption inquiry for the seventh review of the 1989 antidumping duty orders.  See Barden-FAG's Mem. at 12-15; RHP-NSK's Mem. at 31-35.  Barden-FAG also argues that even if Commerce possessed the authority to conduct such an inquiry, Commerce's methodology for determining duty absorption was contrary to law and, accordingly, the case should be remanded to Commerce to reconsider its methodology.  See Barden-FAG's Mem. at 15-18.

Commerce argues it properly construed subsections (a) and (c) of § 1675 as authorizing it to make a duty absorption inquiry for antidumping duty orders that were issued and published prior to January 1, 1995.  See Def.'s Mem. at 22-30.  Commerce also asserts that it devised and applied a reasonable methodology for determining duty absorption.  See id. at 30-36.  Torrington generally agrees with Commerce's contentions.  See Torrington's Resp. at 7-12.

**C.    Analysis**

In SKF USA Inc. v. United States, 24 CIT __, 94 F. Supp. 2d 1351 (2000), this Court determined that Commerce lacked statutory authority under 19 U.S.C. § 1675(a)(4) to conduct a duty absorption

inquiry for antidumping duty orders issued prior to the January 1, 1995 effective date of the URAA, Pub. L. No. 103-465, 108 Stat. 4809 (1994). See id. at ___, 94 F. Supp. 2d at 1357-59. The Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews." Id. at __, 94 F. Supp. 2d at 1359 (citing § 291 of the URAA).

Because the duty absorption inquiry, the methodology and the parties' arguments at issue in this case are practically identical to those presented in SKF USA, the Court adheres to its reasoning in SKF USA. The Court, therefore, finds that Commerce did not have the statutory authority under § 1675(a)(4) to undertake a duty absorption inquiry for the applicable pre-URAA antidumping duty order in dispute here.

## V. Commerce's Matching United States Sales to "Similar" Home Market Sales Prior to Resorting to CV

Barden-FAG maintains that Commerce erred in resorting to CV without first attempting to match United States sales, that is, EP or CEP sales, to "similar" home market sales in instances where all home market sales of identical merchandise have been disregarded because they were out of the ordinary course of trade. See Barden-FAG's Mem. at 11-12. Barden-FAG maintains that a remand is necessary to bring Commerce's practice in line with the United

States Court of Appeals for the Federal Circuit's ("CAFC") decision in Cemex, S.A. v. United States, 133 F.3d 897, 904 (Fed. Cir. 1998).  Commerce agrees with Barden-FAG.  See Def.'s Mem. at 22.

The Court agrees with Barden-FAG and Commerce.  In Cemex, the CAFC reversed Commerce's practice of matching a United States sale to CV when the identical or most similar home market model failed the cost test.  See 133 F.3d at 904.  The CAFC stated that "[t]he plain language of the statute requires Commerce to base foreign market value [(now NV)] on nonidentical but similar merchandise [(foreign like product under post-URAA law)] . . . rather than [CV] when sales of identical merchandise have been found to be outside the ordinary course of trade."  Id.  In light of Cemex, this matter is remanded so that Commerce can first attempt to match United States sales to similar home market sales before resorting to CV.

## VI.  Commerce's Below-Cost Sales Test for Barden-FAG

### A.    Background and Contentions of the Parties

Commerce conducted a below-cost test for Barden-FAG and disregarded some home market sales.  See Final Results, 62 Fed. Reg. at 54,073.  Barden-FAG contends that there was no allegation of below-cost sales, and under this Court's decision in FAG (U.K.) Ltd. v. United States ("FAG U.K."), 22 CIT ___, 24 F. Supp. 2d 297 (1998), the absence of such an allegation renders Commerce's use of

below-cost data unlawful.  See Barden-FAG's Mem. at 19.  Barden-FAG
contends that this Court must instruct Commerce to disregard below-
cost sales to conform with FAG U.K.  See Barden-FAG's Mem. at 19.

In the Final Results, Commerce stated that it could not
disregard the fact that it found that Barden-FAG was selling its
products below cost.  See 62 Fed. Reg. at 54,073.  In its brief to
this Court, however, Commerce changed its position and agrees with
Barden-FAG that its actions were unlawful and asks that the Court
remand the issue with instructions to recalculate Barden-FAG's
margin without regard to the results of the below-cost sales test
in order to comply with FAG U.K.  See Def.'s Mem. at 36-37.

Torrington contends that because data is available regarding
Barden-FAG's below-cost sales, it should be used regardless of how
Commerce discovered the sales.  See Torrington's Resp. at 17-18.
Torrington believes it is irrelevant that Commerce discovered these
sales because Barden-FAG provided the information rather than
because of an inquiry designed to find such sales.  See id. at 19-
20.

**B.   Analysis**

Section 1677b(b)(1) provides that Commerce is empowered to
disregard sales in the determination of NV if several preconditions
are met.  First, Commerce must have "reasonable grounds to believe

or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product." 19 U.S.C. § 1677b(b)(1). "Reasonable grounds to believe or suspect" exist in two circumstances described in § 1677b(b)(2)(A):

> There are reasonable grounds to believe or suspect that sales of the foreign like product were made at prices that are less than the cost of production of the product, if—
>
> (i) in an investigation initiated under section 1673a of this title or a review conducted under section 1675 of this title, an interested party . . . provides information, based upon observed prices or constructed prices or costs, that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of the product; or
>
> (ii) in a review conducted under section 1675 of this title involving a specific exporter, the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or if a review has been completed, in the most recently completed review.

Id.

If Commerce has the requisite reasonable grounds for suspicion, it must then determine whether "in fact, such sales were made at less than the cost of production." 19 U.S.C. § 1677b(b)(1). In order to disregard sales made at less than the

cost of production, Commerce must also find that they "have been made within an extended period of time in substantial quantities, and . . . were not at prices which permit recovery of all costs within a reasonable period of time."  Id.

In the Final Results, Commerce did not clearly articulate its rationale for conducting the below-cost test.  See 62 Fed. Reg. at 54,073.  Commerce merely stated that it was required to disregard below-cost sales because "pursuant to [its] determination [in the fifth review] of below-cost sales by Barden in the [home market], in accordance with section 773(b)(2)(A)(i) [1677b(b)(2)(A)(i)] of the Tariff Act," Commerce had the authority in the instant review to request cost information and apply the cost test.[6]  Id. Commerce did not point to the "reasonable grounds," if any, it had

_____

[6]  In the fifth review, Commerce had conceded that it did not have the requisite reasonable grounds to suspect that Barden-FAG made sales below cost, but had conducted the test because of information it received when it improperly collapsed the data of FAG and Barden-FAG.  See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews ("AFBV"), 61 Fed. Reg. 66,472, 66,490 (Dec. 17, 1996).  In FAG (U.K.) Ltd. v. United States ("FAG U.K."), 22 CIT ___, 24 F. Supp. 2d 297 (1998), this Court invalidated the results in AFBV of Commerce's below-cost test with respect to Barden-FAG because this Court found that it was unlawful for Commerce to conduct such a test without "reasonable grounds to believe or suspect" that Barden-FAG made below-cost sales.  See FAG U.K., 22 CIT at ___, 24 F. Supp. 2d at 300.  FAG U.K. was decided under the law as it existed prior to the URAA amendments.  See id. at 298 n.1.

to suspect that Barden-FAG was making below-cost sales in the instant review, and the Court will not guess why Commerce decided to conduct the below-cost test.[7]  Moreover, subsection (i) and (ii) of § 1677b(b)(2)(A) define what constitutes sufficient evidence with which to form reasonable suspicion, and there is no evidence in the <u>Final Results</u> that Commerce relied on the type of information required to form the "reasonable grounds to believe or suspect" that below-cost sales existed before it initiated the investigation.

Because Commerce's determination is unsupported by substantial evidence on the record, the Court remands this issue to Commerce and instructs it to recalculate Barden-FAG's dumping margin without regard to the results of the below-cost test.

_____

[7]  Indeed, the Supreme Court has opined:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'

<u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196-97 (1947) (quoting <u>United States v. Chicago, M., St. P. & P.R. Co.</u>, 294 U.S. 499 (1935)).

## CONCLUSION

This case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review; (2) match Barden-FAG's United States sales to similar home market sales before resorting to CV; and (3) recalculate Barden-FAG's dumping margin without regard to the results of the below-cost test.  Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    August 3, 2000
          New York, New York